IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

RAYMOND L. SANDERS &       )
SHAWNDA SANDERS,           )
                           )
     Plaintiffs,           )
                           )
          v.               )     3:10cv459
                           )
UDR, INC d/b/a             )
DOMINION CREEKWOOD,        )
                           )
     Defendant.            )


**M E M O R A N D U M   O P I N I O N**


        This matter is before the Court on a bench trial

pursuant to Plaintiffs Raymond and Shawnda Sanders'

("Plaintiffs") consolidated claims against Defendant UDR, Inc.

("Defendant" or "UDR"), arising out of alleged mold

contamination of an apartment Plaintiffs rented from Defendant.

This Court held a trial from March 14 to 16, 2011 to resolve

Plaintiffs' claims of negligence, negligence *per se*, actual

fraud, and constructive fraud.[1]  After reviewing and considering

the relevant evidence, including exhibits and witness testimony

at trial, as well as briefing by the parties,[2] the Court, for the

_____

[1] Plaintiffs' breach of contract claim was dismissed at the close of
Plaintiffs' case at trial.  (Tr. 601:10-14.)
[2] Plaintiffs' Proposed Findings of Fact [Dkt. 120] shall be abbreviated ("P
FoF"), and Defendants' Proposed Findings of Fact [Dkt. 121] shall be
abbreviated ("D FoF").

reasons set forth below, finds in favor of Defendant and makes the following findings of fact and conclusions of law.

## I. Findings of Fact

### The Parties and the Apartment

1. Plaintiff Shawnda R. Sanders is a 28-year-old, nonworking mother of one child, who was born in November, 2007. (Tr. 28:2.)

2. Plaintiff Raymond L. Sanders, Mrs. Sanders's husband, is 28-years-old and is an employee at Walmart, where he has worked since September 2001, as well as an ordained minister. (Tr. 428:10-429:16.) Mr. Sanders has led a difficult life; at age 12 his brother was killed playing with a gun, and he later lost his grandmother to cancer . (Tr. 432:17-24.)

3. After meeting in college, Mr. and Mrs. Sanders purchased a home together, which they subsequently lost to foreclosure. (Tr. 434:4-14.)

4. After this, on August 22, 2008, Plaintiffs entered into a lease with Defendant for unit 5727E, Kilrush Court, in Henrico County, Virginia, a two-bedroom apartment at the Dominion Creekwood apartment complex, owned by Defendant (the "Apartment"). (PX 1.)

### The Water-Related Events and the Parties' Responses

5. A number of water-related events occurred during Plaintiffs' occupancy of the Apartment.

6.    First, in September 2008, (Tr. 39:14-17) Plaintiffs noticed a water stain in their son's bedroom, near the vent in the room, (Tr. 33:1-5).  In response, a maintenance man spray-painted the area with a water sealer and left, leaving no known receipt for his work.  (Tr. 38:7-14.)  No representations were made that the work was done.  (Tr. 39:8-10.)

7.    Second, in November 2008, (Tr. 42:18-19), water entered through the master bedroom window, accumulating at the bottom of the window ledge, (Tr. 40:14-41:22).  Mrs. Sanders noted what appeared to be mold on the ledge.  (Tr. 42:2-16.) She called maintenance, showed them the mold, and they caulked the window and caulked over the mold.  (Tr. 42:22-43:9.)  Again, maintenance made no representations regarding the work.  (Tr. 44:17-25.)

8.    Third, in December 2008, water again entered through the master bedroom window.  (Tr. 45:1-16.)  Maintenance re-caulked it.  (Tr. 45:23-25.)

9.    Fourth, in May 2009, water was found dripping in the kitchen pass-through.  (Tr. 48:17-49:9.)  Maintenance came, said the leak was coming from the apartment above, and went upstairs to deal with it.  (Tr. 49:14-50:11.)  The leak apparently stopped, but nothing was done in Plaintiffs' unit. (Tr. 50:3-5.)

10.  Fifth, also in May 2009, water came through the living room ceiling.  (Tr. 50:12-51:3.)  Maintenance came, hammered out the wet area, and told Mrs. Sanders that the area needed to dry before it could be repaired.  (Tr. 51:3-15.)  The hole stayed open for two or three days until Mr. Sanders went to the rental office concerned.  (Tr. 51:24-51:3.)  A maintenance man was present at the time and told Plaintiffs that he would come back and check whether the area had dried.  (Tr. 52:6-10.)  He returned and said the area still needed drying.  (Tr. 52:13-19.)  About two days later, he returned and "patched" the hole with something of an upside-down plaster-bubble drooping from the ceiling.  (Tr. 52:22-53:7.)

11.  Sixth, in June 2009, water oozed through the master bedroom window.  (Tr. 53:11-16.)  Mrs. Sanders attempted to stanch the flow with towels, but water entered the room.  (Tr. 53:16-25.)  Everything in the area got wet, including her infant son's bed.  (Tr. 53:10-14.)  Although there had already been two leaks in this area, Mrs. Sanders assumed the problem had been fixed and assumed it was safe to put her son's bed by the window.  (Tr. 54:18-55:6.)  Unhappy with this additional leak, Plaintiffs submitted a letter to the rental office (PX 2), after which maintenance came and re-caulked, and also told her that an outside contractor would be coming.  (Tr. 60:5-12.)  Maintenance left a work order this time.  (Tr. 66:18-19.)

12.  Maintenance came shortly after Plaintiffs' letter and hammered out the wall around the window.  (Tr. 60:15-22; 65:21-25.)  Edward Longfellow, the outside contractor, then came to the property on June 8, 2009, examined the window area, re-caulked it, and removed additional sheetrock from the wall around and below the window.  (Tr. 615:23-616:16.)  He removed insulation and vacuumed out the stud cavities, finding no moisture, but finding evidence of past moisture.  (Tr. 618:9-20.)  He did not remove the baseboard, and mold was later found between the baseboard and the sheetrock.  (Tr. 629:17-633:22.)

13.  Plaintiffs recorded a number of videos and still-photographs showing the condition of the windows.  (See. P. Exs. 15, 19, 69, 71, 72, 73, 77.)  These images show what appears to be mold, discoloration, and water damage around the window.  The images are not time or date-stamped, however, and are therefore of little use in determining the extent to which maintenance failed to address the leaks.

14.  Courtney Burkheimer, Property Manager at Dominion Creekwood, viewing the black spots, said that they were "mildew, not mold," despite not knowing the difference between the two. (Tr. 551:15-552-22.)

15.  Plaintiffs slept in the apartment the night of June 8, and during the night, Mr. Sanders allegedly woke up unable to breathe.  (Tr. 74:21-75:3.)  Mrs. Sanders allegedly

took him to the emergency room. *Id.* No record of this hospital visit exists, however. *Id.*

16. On June 19, 2009, Plaintiffs sent a certified letter requesting cleaning of all mold. (Tr. 82:1.) That same afternoon, the outside contractor returned and repaired the wall. (Tr. 82:1-4.)

17. Seventh, on Sunday night, June 20, 2009, water backed up throughout the house's plumbing, in the sink, toilet, and dishwasher. (Tr. 82:10-13.) Plaintiffs reported the problem to maintenance, calling the "emergency line" because it was after-hours. (Tr. 82:17-18.) Having received no reply by the following morning, Mr. Sanders went to the rental office to inform the staff of the problem. (Tr. 83:17-23.) Maintenance eventually came out and poured something down the sink, but did not clean the toilet, sink, or dishwasher. (Tr. 84:25-85:9.)

18. Eighth, on July 5, 2009, Plaintiffs noticed mold and water on the master bedroom closet ceiling. (Tr. 85:25-86:20.) Maintenance came out, hammered out the molded area, detached the dryer exhaust hose and rigged a sort of dust collector out of a bucket of water to collect dryer exhaust. (Tr. 86:5-15.) Maintenance came back the next day and used what appeared to be a combination of tape and plaster to patch the hole, leaving a drooping plaster-bubble over the hole, and which

appeared to still have water rings around it. (Tr. 88:10-89:23.)

19. On July 10, 2009, Plaintiffs left the Apartment. (Tr. 90:23-24.)

<u>Mrs. Sanders's Health</u>

20. Mrs. Sanders claims that the following problems resulted from her time living at the Apartment, (Tr. 101:21-105:1).

a. Financial burden, including:

    i. limited family outings;

    ii. paying for basic necessities;

    iii. inability to travel;

    iv. husband's medications require going through security checkpoint when flying;

    v. change in diet;

    vi. educational plans on hold; and

    vii. forced to take additional responsibility at home.

b. Personal pain and suffering, including:

    i. excruciating headaches;

    ii. dizziness;

    iii. hair loss (having to shave head);

    iv. blisters;

    v. the need for painful and inconvenient allergy shots; and

    vi. forced environmental sensitivity.

7

> c. Emotional damage, including:
>
> > i. marital strain;
> >
> > ii. fear for husband's health;
> >
> > iii. embarrassment due to blistering on lips and hair loss; and
> >
> > iv. fear for loss of husband's job.

21.    On June 5, 2007, during her pregnancy and before Plaintiffs moved into the Apartment, Mrs. Sanders visited Dr. Leigh Lewis at the Virginia Women's Center. (Tr. 106:20-25.) A record from that appointment states "allergies worse." (DX 43.) Mrs. Sanders claims not to recall "having that discussion with her" regarding allergies and claims that, in fact, her allergies were not worse at that time. (Tr. 108:15-21.)

22.    In November 2007, Mrs. Sanders visited Virginia Family Physicians. (Tr. 109:20-22.) Although she claims not to remember much about this visit, including whether she was in fact experiencing allergies at the time (Tr. 109:23-110:4; 110:17-21), the records from that visit again refer to her allergies, including that she was "[h]aving allergies," and "[n]ose stuffy at night." (DX 45.) The record states "[c]hronic sneezing," but Mrs. Sanders claims that in fact she was not having chronic sneezing at that time. (Tr. 111:3-6.) The record states she had "[b]een on lots of allergy medicines in the past," but Mrs. Sanders claims that in fact that statement is simply false. (Tr. 111:7-13.) On the appointment

record the word "congestion" is circled, but Mrs. Sanders claims that she did not tell her doctor that she had congestion at the time. (Tr. 112:15-24.) The record states that Mrs. Sanders was referred to "VAPAA" for "allergy testing," which Mrs. Sanders agreed occurred. (Tr. 111:14-24.) But Mrs. Sanders claims that her referral was purely for a "stuffy nose," and that "[w]e did not discuss allergies." (Tr. 111:25-112:10.)

23. In January 2008, Mrs. Sanders went to see the allergy specialist at "VAPAA," Dr. Elaine Turner. (Tr. 113:21-114:6.) (DX 41.) Though Mrs. Sanders claims that at the time she was not having headaches (Tr. 115:5-7), a record of that visit has the words "Chronic Headaches" circled (Tr. 117:15-118:6). Though Mrs. Sanders claims that she said nothing with regard to sinus congestion, the record states "Chronic Sinus Congestion." (Tr. 118:21-119:5.) Though Mrs. Sanders claims that she was not experiencing sneezing, itchy throat, or a runny nose, the record states that she complained of "[n]asal congestion, headache, runny nose, sneezing, itchy throat, and itchy nose." (Tr. 115:8-13; 121:3-5.) Though Mrs. Sanders claims that she said nothing as to her condition increasing over the past year, the form states "[t]his has been gradually increasing over about a year." (Tr. 121:9-16.) The record additionally lists, under the word "Impression," "Allergic rhinitis." (DX 41, p. VA-7.) And listed under "Plan" is

"Environmental control for dust mite as explained to patient."
(Tr. 120:7-12.)  Again, Mrs. Sanders claims that she remembers
no such explanation being given.  (Tr. 120:13-15.)   Mrs.
Sanders claims this record is simply false overall in what it
states.  (Tr. 118:9; 119:4-5; 121:17-122:5.)  She does not
dispute, however, that she was additionally tested for a number
of circled items from the record, including ragweed and mites,
and that she did not test as allergic to any trees or grasses.
(Tr. 155:13-157:9; DX 41, p. VA-6.)  And one aspect of this
visit on which Plaintiffs rely is allergy skin testing performed
by Dr. Turner, which failed to show an allergic response to mold
for Mrs. Sanders.  (Tr. 355:3-14.)

　　　　24.  Mrs. Sanders's cross-examination testimony
regarding these medical records lacked credibility.  It was
evasive and believable only if one believes that her doctors
somehow conspired to falsify her medical records to make her
appear to have various allergies.

### Mr. Sanders's Health

　　　　25.  Mr. Sanders, meanwhile, experienced two
significant, stressful events prior to moving into the
Apartment: the loss of his house to foreclosure (and apparently
having to declare bankruptcy) (Tr. 472:17-21), and troubles at
work.  He claims to have been denied a deserved promotion at
Walmart and claims that he was severely physically abused by his

manager there. (Tr. 436:4-437:18.) He took a leave of absence
due to the stress at work. (Tr. 437:21-23.)

26. Mr. Sanders twice saw a licensed counselor named
Jackie Pollard, telling her that he was experiencing anxiety and
depression. (Tr. 438:5-23.) He also mentioned to Ms. Pollard
that he was allergic to pollen. (DX 33.) Following treatment
with Ms. Pollard, he felt better and returned to work. (Tr.
438:18-25.)

27. Mr. Sanders claimed that, within a month of
moving into the Apartment, he would wake up every morning and
spit up phlegm and that he began to experience rashes on his
hands, thigh, and calf. (Tr. 436:4-9.) Mr. Sanders also
experienced respiratory problems while at the Apartment (Tr.
445:6-10), and visited the emergency room seven times, (Tr.
447:1-4). Mr. Sanders is currently taking a large number of
prescription medications. (Tr. 457:13-458:14.)

28. Mr. Sanders claims that the following problems
resulted from his time living in the Apartment, (Tr. 460:2-
463:22).

        a. Financial burden, including:

           i. having to leave work due to illness;

           ii. having to borrow money from family;

           iii. having to cut electrical use to pay for
                prescriptions;

           iv. denial of promotion at work; and

v. fear for ability to support child on the way.

b. Personal pain and suffering, including:

    i. inability to wash self in the tub due to sickness;

    ii. excruciating headaches to the point of having to lay down;

    iii. difficulty breathing;

    iv. being stabbed with needles in arms and rear end during treatments;

    v. sensitivity to light;

    vi. sensitivity to colognes, perfumes;

    vii. having to sleep in hospital with cords and wires stuck to his head and feet;

    viii. having to carry a bag full of medicine everywhere;

    ix. having to undergo an MRI; and

    x. swollen knees to the point of being unable to kneel to pick things off the ground.

c. Emotional and other damage, including:

    i. marital strain;

    ii. separation from wife and son;

    iii. fear for inability to play with son outside due to allergies;

    iv. inability to race for Children's Miracle Network to raise money for kids;

    v. having lost nearly every member of his church besides his immediate family;

    vi. having been suspended from graduate school due to low grades due to illness;

vii. inability to get out of bed;

    viii. having needed people to come and sit
          with him so Mrs. Sanders could run
          errands;

     ix. crying;

      x. feeling a lack of control over life;

     xi. inability to visit mother due to long
          drive; and

    xii. inability to perform yard work due to
          allergies to things outside.

29.   Prior to the June 2008 incident, where water came through the master bedroom window, Mr. Sanders had not seen any doctors for anything related to allergies or the conditions in the Apartment. (Tr. 476:21-477:1.)

30.   In November 2008, Mr. Sanders met with a physician's assistant named Heather Sedwick. (Tr. 478:8-19; DX 35.) He told Ms. Sedwick that he was having trouble sleeping because of frustration at work and anxiety, that he was experiencing anxiety attacks for the three weeks before the visit, that he was having trouble remembering things, and that he was suffering from depression. (Tr. 478:20-481:5.) Ms. Sedwick then referred Mr. Sanders to Jackie Pollard.

31.   During cross-examination regarding this appointment, Mr. Sanders again and again could not recall things that he testified to during his deposition, appearing evasive and undermining his credibility. Like his wife, Mr. Sanders insinuated that nothing stated in the medical record from this

examination was reliable because he was not its author. (Tr. 480:7-9.) And like his wife, Mr. Sanders struck this Court as evasive, combative, and not credible.

32. Especially strange, in this Court's view, was Mr. Sanders's evasiveness on the question of whether he told Jackie Pollard during their subsequent appointment that he had contemplated suicide--seemingly, something he would know. (Tr. 486:1-12.) Also indicated on the record from this appointment was his having had panic attacks, yet, again, he claimed not to remember having had panic attacks and was extremely evasive on this point. (Tr. 486:17-488:14.) And again, Mr. Sanders equivocated on the question of whether he had told Jackie Pollard that he was allergic to pollen (he had). (Tr. 490:13-23.)

## Dr. Vilseck's Testimony

33. Dr. Joseph Vilseck is a treating physician for both Plaintiffs and offered testimony as to the cause of their allergic symptoms.

34. On August 5, 2009, Mrs. Sanders met with Dr. Vilseck. (Tr. 122:7-15.) She told him that she had experienced hay fever while at the Apartment, and that the Apartment was the only place she had ever experienced hay fever. (Tr. 122:20-123:2.) She also told him that rain, dampness, pollen, and dust aggravate her allergies--things she had not told Dr. Turner in

January of 2008--and testified to having allergies to rain, dampness, cosmetics, smoke, and certain foods. (Tr. 123:6-124:9.) Dr. Vilseck tested Mrs. Sanders for mold allergies, and she reacted to mold. (Tr. 355:19-24.) As of trial, she was continuing to see him for vaccine therapy (*i.e.*, allergy shots). (Tr. 92:13-21.) She is getting vaccine therapy for mold, as well as pollen, ragweed, dust mites, and cockroaches. (Tr. 151:22-152:10.)

35. Mr. Sanders is also being treated by Dr. Vilseck. (Tr. 345:1-2.) Dr. Vilseck found that Mr. Sanders has a very small oropharyngeal opening (*i.e.*, opening of the back of the mouth into the pharynx). (Tr. 345:9-11.) He found that Mr. Sanders does not have asthma. (Tr. 348:16-22.) He found that Mr. Sanders does not suffer from vocal cord dysfunction. (Tr. 350:24-351:2.)

36. Dr. Vilseck tested Mr. Sanders for mold with a back scratch test, and Mr. Sanders tested as highly allergic to mold. (Tr. 356:6-21.) Specifically, Mr. Sanders tested positive for Alternaria, which is the most common form of *outdoor* mold. (Tr. 396:15-24.)

37. Mr. Sanders also tested as allergic to dust mites and animal dander. (Tr. 385:23-386:1.) Any of these allergens can cause allergic rhinitis. (Tr. 386:8-11.) Dr. Vilseck testified that he has no data regarding the presence of dust

mites, pollen, or animal dander in the Apartment. (Tr. 389:12-22.) Mr. Sanders is currently receiving a number of medications and treatments for his allergies. (Tr. 366:21-374:12.) Dr. Vilseck believes that Mr. Sanders is "making good headway" in his treatment--an opinion seemingly at odds with Mr. Sanders's testimony as to his personal health condition. (Tr. 413: 5-7.)

38. Dr. Vilseck testified that some of Mr. Sanders's symptoms, such as chest tightness, could have resulted from psychological problems. (Tr. 409:16-410:12.)

39. Dr. Vilseck additionally testified that musty odors, in and of themselves, can cause ill health effects. (Tr. 420:5-6.) This testimony strongly undermines his credibility, as it not only defies common sense, it does not remotely follow from the passage in his expert report that he cites in support of it: "To state that only mold can cause health effects in a building is difficult to prove in that other materials can produce VOCs [Volatile Organic Compounds]. But only mold can produce a moldy, musty odor and mold spores." (Tr. 420:1-4.)

40. Exposure to mold can cause a previously non-sensitive individual to become sensitive. (Tr. 358:6-8.) However, Dr. Vilseck testified that he is unaware of *when* Mr. Sanders was sensitized to any of his current allergens. (Tr. 386:17-387:1; 745:4-25.) As Dr. Bardana, Defendant's expert witness, pointed out, "[Mr. Sanders] could have been allergic

since he was six." (Tr. 787:19-20.) And, significantly, Dr. Vilseck cannot say whether Mr. Sanders was sensitized to mold before moving into the apartment. (Tr. 387:2-4.) Indeed, Mr. Sanders tested positive for a number of molds that were *not* present in the Apartment. (Tr. 745:17-19.) That indicates that Mr. Sanders became sensitized to those allergens as a result of exposure to them in the outside environment. (Tr. 745:21-15.) There is no way to determine that the same is not true for the molds present in the apartment.

41. Dr. Vilseck initially diagnosed Mr. Sanders as having "episodes of acute infectious asthma headaches." (Tr. 399:10-16.) But after reviewing the report of Dr. Bardana, which concluded that Mr. Sanders does not have asthma, Dr. Vilseck *changed his diagnosis* to "twitchy lung syndrome" or "asthma variant." (Tr. 399:14-401:20.) Dr. Bardana believes instead that Mr. Sanders had "vocal chord dysfunction," not "twitchy lung syndrome" or "asthma variant". (Tr. 738:25-739:7.) Although the Court finds Dr. Bardana's diagnosis more credible, it is of little consequence, as in either case, no evidence exists that either affliction was caused by conditions at the Apartment.

42. Dr. Vilseck has a long history of handling mold cases for Plaintiffs' counsel, and in 100% of his current cases he works on plaintiffs' mold cases. (Tr. 378:7-17.) More

importantly, he essentially testified in this case under a
contingency fee.  His fee was contingent, that is, it depended
upon Plaintiffs prevailing in this case.  (Tr. 387:9-11.)  The
Sanderses have not paid him for any of their expenses; the idea
being that he will be paid if they win their lawsuit.  (Tr.
378:22-379:11.)  Indeed, Plaintiffs' legal victory will be Dr.
Vilseck's financial windfall, as he will be paid the costs of
both their past and *future* treatment.  The Court finds this
arrangement seriously unsettling, ethically suspect, and utterly
devastating to his credibility.  *See, e.g.*, *Sutherlin v. White*,
71 Va. Cir. 184, 2006 WL 173860, at *3 (Va. Cir. Ct. June 26,
2006) (citing Va. Sup. Ct. R. Part 6, § II, Rule 3.4 cmt. 3)
("Indeed, maintaining the independence of an expert witness is
the chief reason why the common law has long recognized that an
expert may not be paid with a contingency fee.").

43.  Also, oddly, Dr. Vilseck may have collected some
insurance payment for Plaintiffs' immunotherapy, yet he appears
to bill Plaintiffs' insurance company for "[a]llergic rhinitis
due to pollen," even though there is a specific code for "mold
spores."  (Tr. 384:3-20; 422:3-5.)  Presumably his reason for
this is that Mr. Sanders suffers allergic rhinitis due to both
pollen and mold spores and that the vaccine ordered under either
is the same.  (Tr. 422:9-11.)  But his choice to bill under

pollen nonetheless signifies which he feels is the greater cause of Mr. Sanders's symptoms. (Tr. 383:5-23.)

44. Compared with Dr. Vilseck, Defendant's allergy and immunology expert, Dr. Emil Bardana, Jr., struck this Court as more competent and vastly more credible, both in his opinions and his courtroom demeanor. Notably, as opposed to working under the practical equivalent of a contingency fee, Dr. Bardana actually finds against his clients' interests in 25% of workman's compensation cases in which he is engaged. (Tr. 760:3-6.)

45. "IgE" [immunoglobulin E] is an antibody all people have, the value of which corresponds to genetic inclination to develop allergies. (Tr. 740:6-21.) Mr. Sanders has a very low IgE value, indicating a lack of a genetic predisposition to allergies, and making it unlikely that he would ever develop a significant allergy, including to mold. (Tr. 739:16-23; 742:7-9.)

46. Mrs. Sanders, on the other hand has a high IgE, indicating a strong disposition towards allergies. (Tr. 756:18-22.) Like Mr. Sanders, she tested allergic not only to mold found inside the Apartment, but also to mold and other substances found *outside* the apartment, including mold types found *only* outside the apartment. (Tr. 757:5-13.)

47.   Damp indoor spaces, if left unremediated, can lead to mold growth and mold growth can lead to adverse health effects.  (Tr. 181:7-12; 183:16-25.)

48.   The primary means of exposure to mold is inhalation.  (Tr. 184:3-9.)  It is unknown how many mold spores are necessary to cause human illness.  (Tr. 184:24-185:5.) Though mold can negatively affect human health, it is not a particularly potent allergen.  (Tr. 729:5-730:15.) Individual sensitivity (*e.g.*, a history of allergies) plays a large role in mold's health effect, however, as does duration of exposure. (Tr. 184:6-17.)

49.   Three molds were found at the Apartment.

      a. First, aspergillus, which can cause headaches, wheezing, bronchitis, asthma, severe fatigue, and shortness of breath. (Tr. 181:16-21.)

      b. Second, stachybotrys, is black in color and grows slowly, requiring high concentrations of water over an extended period of time. It is the most toxic of the three.  (Tr. 193:5-25.)

      c. Third, cladosporium, "is normally the initial invader" and only requires 13%

moisture to grow, whereas stachybotrys

requires 20%.  (Tr. 193:14-19.)

50.  These molds, in theory, are capable of causing allergic symptoms, including rhinitis, shortness of breath, wheezing, asthma, "asthma-like," and bronchitis.  (Tr. 196:7-10.)

51.  Proper remediation, in simple terms, starts with stopping the water intrusion, then removing damaged material and sterilizing the area.  (Tr. 188:15-190:5.)  A good way to detect the location of a window leak is to spray water from a hose at the window; it is not acceptable to wait for the next rainfall to figure out where the leak is.  (Tr. 192:6-16.)  Also, simply caulking over mold is obviously not an adequate remedial measure, even if it temporarily eliminates the mold exposure. (Tr. 697:20-699:17.)

52.  Stanley Yeskolski, Jr., an expert in damp indoor spaces and mold investigation, performed air-sample and tape-lift tests for mold at the Apartment, as well as air-sample testing of the outside air.

53.  The following were found:

        a. In the air-handler insulation (Tr. 281:22-282:10):

       i. a light amount of aspergillus, in the amount of 107 spores per cubic-meter of air (Tr. 318:12-14), and

      ii. a heavy amount of cladosporium, in the amount of 27 spores per cubic-meter of air, (Tr. 318:15-18).

b. In the master bedroom (PX 17):

       i. a light amount of aspergillus, in the amount of 13 spores per cubic-meter of air, and

      ii. a light amount of cladosoprium, in the amount of  13 spores per cubic meter of air.

c. On the drywall behind the baseboard below the master bedroom window (Tr. 282:11-13):

       i. a light amount of aspergillus, and

      ii. a heavy amount of stachybotrys, which indicates the presence of a significant amount of water over an extended time period.  (Tr. 267:2-19; 283:3-4.)

d. Outdoors:

       i. aspergillis, in the amount of 293 spores per cubic-meter of air, which is 22 times more than the master bedroom,

three times more than the HVAC, (Tr. 317:15-22; 318:12-14); and

    ii. cladosoprium, in the amount of 1,267 spores per cubic-meter of air, which is 97 times higher than the master bedroom, 47 times higher than the HVAC, (Tr. 318:2-7; 318:15-18).

54. Culture analysis further showed very high levels of penicillium, which typically indicates mold growth. (Tr. 287:2-7.)

55. The mold levels found inside the Apartment fell far below the normal level found in most homes, which is 1,500 to 2,500 spores per cubic meter. (Tr. 747:18-21.)

56. No tests were conducted inside the apartment for other allergens such as dander, fibers, and pollen. (Tr. 314:8-20.)

57. At the time of the testing, moisture readings inside the Apartment were within the normal range. (Tr. 262:4-16; 264:8-13.) There are, however, no moisture readings as to the moisture at the time of the alleged water intrusions.

## III.  Analysis

Plaintiffs claim negligence, negligence *per se*, actual fraud, and constructive fraud.[3]  The Court considers these claims in turn.

### A.  Negligence

As the place of the alleged wrong here is Virginia, this Court applies Virginia law in this case.  *Colgan Air, Inc. v. Ratheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). Under Virginia law, ordinary or simple negligence involves "the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 488 (2004).  A party alleging ordinary negligence must establish the following elements to prevail: (1) duty, (2) a breach of that duty, (3) proximate causation, and (4) damages. *McGuire v. Hodges*, 273 Va. 199, 206 (2007).

### i.  Duty

"It is well-settled in Virginia that, under the common law, a landlord has no duty to maintain in a safe condition any part of the leased premises that [is] under [a tenant's] *exclusive* control."  *Isbell v. Commercial Inv. Assocs., Inc.*, 273 Va. 605, 611 (2007) (citation and internal quotation marks omitted).  Where, however, the landlord enters leased premises

---

[3] Plaintiffs abandoned their Breach of Contract claim during trial, and it is therefore dismissed.  (Tr. 601:10-11.)

to make repairs and does so negligently, he may be liable for
resulting damages. *Holland v. Shively*, 243 Va. 308, 311 (1992).
Moreover, a landlord also has a duty "to maintain in good repair
and free of latent defects the areas over which [it] has
control." *Frazier v. Strobel*, 58 Va. Cir. 456, 2002 WL
31431546, at *2 (Va. Cir. Ct. Apr. 19, 2002).  Having identified
these duties and finding that Defendant owed a duty Plaintiffs
to not make negligent repairs and to maintain in good repair and
free of latent defects the areas over which it had control, the
Court now considers whether the Defendant breached these duties.

     ii.    <u>Breach</u>

     The Court finds that Defendant breached the duty
arising from its entering into the Apartment to make repairs.
Water entered Plaintiffs' master bedroom window on three
occasions.  In the first instance, in November 2008, maintenance
not only caulked the window so poorly that it needed to be re-
caulked just one month later, they caulked over what appeared to
be mold, a remedy that one need not be an industrial hygienist
to know is inadequate.  Regardless, the first caulking effort
proved insufficient after just one month, something that
seemingly would have signaled to maintenance to do a
particularly good caulking job the second time around.  Yet just
six months later, water again oozed through the window.  And
although it is unclear to the Court exactly what remedial

measures were performed by Edward Longfellow (the outside contractor), what is clear is that, for some reason, despite cutting away a large portion of the wall, Mr. Longfellow did not remove and inspect the baseboard at the bottom of the wall--an area where mold was later discovered.  The Court fails to see a justification for this course of action; if Mr. Longfellow performed anything near the amount of work he claims to have performed, looking behind the baseboard would have been an reasonable step and would have revealed the mold.

Taken together, these events show that Defendant was aware of a leaking problem with this window and repeatedly made lackluster efforts to repair it.  The evidence is sufficient to show the breach of Defendant's duty arising from its attempts at repair by repairing in a negligent manner.

As for Defendant's duty to maintain the overall building in good repair and free of latent defects by reasonably inspecting it, "[w]hether or not reasonable care was used in making inspections depends on the facts and circumstances of each case."  *Gumenick v. United States*, 193 S.E.2d 788, 795 (1973).  Generally speaking, Plaintiffs' apartment suffered from such an abnormal number of water-related incidents that Defendant failed to use reasonable care in maintaining the building in which that apartment was housed.  Here too, the evidence is sufficient to show breach of a duty.

This Court therefore turns to the issue of causation.

### iii.    Proximate Causation

Causation can be broken down into two parts: general and specific. "'General causation' refers to whether X *can* cause Y. . . . On the other hand, 'specific causation' refers to whether X *did* cause Y in a given case." *Cavallo v. Star Enter.*, 892 F. Supp. 756, 771 n.34, *aff'd in relevant part*, 100 F.3d 1150, 1159 (4th Cir. 1996). In this Court's view, though the evidence on general causation is mixed, the evidence on specific causation in this case is clear and dispositive to all the claims in this case. This Court will therefore turn immediately to specific causation.

The gist of Plaintiffs' specific causation theory is that Mr. Sanders had no history of respiratory problems before living at the Apartment but is now allergic to mold and exhibits respiratory problems, and that Mrs. Sanders did not test positive for mold allergies in 2008 but did test as allergic to mold after living at the Apartment. Their causation theory falls well short of proving causation on a number of fronts.

Beginning with Mr. Sanders, both sides' experts agree that there is no way to know *when* he became allergically sensitized to mold. (Tr. 386:23-387:1; (Dr. Vilseck) ("Q. In fact, you can't say whether or not he was sensitized – you don't know when he was sensitized to mold. A. Correct."); (Tr.

27

787:19-20 (Dr. Bardana) ("[H]e could have been allergic since he was six."). He could have been allergic to mold well before moving into the Apartment. There is therefore no way to show, by a preponderance of the evidence, that conditions in *the Apartment* caused his allergies. Indeed, Mr. Sanders tested positive to numerous molds *not* found in the Apartment. (Tr. 745:17-19.)

Nor does the evidence show that conditions in the Apartment caused his symptoms. Mr. Sanders tested allergic to a number of common allergens including animal dander and dust mites. (Tr. 385:23-386:1.) No tests were performed for the presence of these allergens in the Apartment; thus, this Court cannot know what effect those allergens had on his health. (Tr. 314:8-20.) Meanwhile, air-cassette sampling showed that the molds found inside the Apartment existed in far greater quantities in the air *outside* the Apartment. (PX 17.) This leaves no way to link, by a preponderance of the evidence, mold found in the apartment to Mr. Sanders's symptoms, and, therefore, no specific causation.

As for Mrs. Sanders, she, at least, failed to test positive for mold before living at the Apartment and tested positive afterwards. But even assuming that this means that living in the Apartment caused her to develop an allergy--a tenuous assumption given the far higher *outdoor* mold readings--

her health history leaves no way to link, by a preponderance of the evidence, her mold allergy to any subsequent health effects. The evidence showed that Mrs. Sanders had a history of allergies and doctors' visits for the very same symptoms as those presented in this case. Her denials of the details of numerous presumably impartial medical records rang false to the Court, and, thus, her credibility was weak at best. Moreover, like Mr. Sanders, she too is allergic to a number of other allergens, none of whose presence was tested in the Apartment. It is therefore again impossible to connect, by a preponderance of the evidence, her symptoms with the mold found in the Apartment.

For these reasons, Plaintiffs' specific causation proof falls far short, meaning that their negligence claim must fail.

B. <u>Plaintiffs Remaining Claims</u>

As Plaintiffs acknowledge, their remaining claims also require findings of specific causation. (P. FoF at 18); *see also Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 79 (2004); *Winn v. Aleda Const. Co.*, 227 Va. 304, 308 (1984) (actual fraud); *Mortarino v. Consultant Engineering Servs., Inc.*, 251 Va. 289, 295 (1996) (constructive fraud). Because Plaintiffs fail to prove specific causation, these claims also cannot stand.

### III.  Conclusions of Law

As explained above, this Court, having diversity jurisdiction over this matter, finds that although Plaintiffs' experience in the Apartment was unpleasant and undeserved, Plaintiffs failed to prove by a preponderance of the evidence that living in the Apartment caused them any injury.  Plaintiffs therefore fail to prove by a preponderance of the evidence their claims for negligence, negligence per se, actual fraud, and constructive fraud.  This Court therefore finds in favor of Defendants on all Counts.

An appropriate Order will issue.

 

|                       | /s/                                 |
|-----------------------|-------------------------------------|
| June 30, 2011         | James C. Cacheris                   |
| Alexandria, Virginia  | UNITED STATES DISTRICT COURT JUDGE  |